UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
BARBARA COSTANZO, *as a legal
successor of Irena Costanzo*,

                          Plaintiff,

          -against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, INVESTIGATOR
JOHN SANTACROCE, NURSE RENA WALKER,
CORRECTION OFFICER WAYNE LOSEE, SERT
OFFICER QUINONES, SERT OFFICER WALSH,
SGT. OLSEN, CORRECTION OFFICER JANE
DOE #1, *each sued in their official and personal
capacities*,

                        Defendants.
--------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
16-cv-3871 (JMA) (ARL)

FILED
CLERK

9:23 am, Mar 11, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES:**

Laura Solinger
Simon Heller
Law Offices of Laura A. Solinger, Esq.
51020 Main Road
Southold, NY 11971-4616
      *Attorneys for Plaintiff*

Stacy Ann Skorupa
Suffolk County Department of Law
H. Lee Dennison Building
100 Veterans Memorial Highway
Hauppauge, NY 11788
      *Attorney for Defendants*

**AZRACK, United States District Judge:**

    Barbara Costanzo ("Plaintiff"), as legal successor of Irena Costanzo ("Plaintiff-

Decedent"), brings this action against the County of Suffolk, Lieutenant Scott Walsh, Sergeant

Richard Olsen and Corrections Officers John Santacroce, Wayne Losee, and Steven Quinones (collectively, "Defendants").  Plaintiff alleges five causes of action pursuant to 42 U.S.C. § 1983 under the Fourth and Fourteenth Amendments arising from an incident that occurred while Plaintiff-Decedent was incarcerated at the Suffolk County Correctional Facility.  Defendants have moved for summary judgment on all claims.  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I. BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements, the declarations, exhibits, and testimony referenced therein, and any additional statements of material facts provided in the parties' briefings.  The facts are undisputed unless otherwise noted.  When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant," in this case Plaintiff. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

Plaintiff-Decedent was incarcerated as a pretrial detainee at the Suffolk County Correctional Facility, from January 15, 2015 to February 12, 2015.  (ECF No. 50-13, Pl. 56.1 Statement ¶ 1.)  She was 17 years old at the time of her incarceration.  (ECF No. 50-21, Pl. Mem. at 1.)  On December 1, 2016, counsel for Plaintiff-Decedent filed a Suggestion of Death, notifying the Court that Plaintiff-Decedent died on October 18, 2016.  (ECF No. 14.)  Plaintiff-Decedent's counsel filed a motion pursuant to Fed. R. Civ. Pro. Rule 25(a) to substitute the decedent's mother, Barbara Costanzo, as plaintiff.  (ECF No. 17.)  The motion was granted.  (ECF No. 18.)

On January 12, 2018, Plaintiff filed a third amended complaint alleging five causes of action arising from Plaintiff-Decedent's incarceration: (1) excessive force violations under the Fourth and Fourteenth Amendments; (2) deliberate indifference to Plaintiff-Decedent's medical

needs violative of the Fourteenth Amendment; (3) deprivation of liberty under the Fourteenth Amendment; (4) sex-based discrimination under the Fourth and Fourteenth Amendments; and (5) Due Process violations under the Fourteenth Amendment.  (ECF No. 27, "TAC".)

The bulk of the claims relate to an incident on January 15, 2015—the day she arrived at the Suffolk County Correctional Facility.  (Pl. 56.1 ¶¶ 3–29.)  During a visit to the jail medical unit, a dispute occurred between Plaintiff-Decedent and Defendant Walker, a nurse practitioner, about the removal of braids and threads woven into Plaintiff-Decedent's hair.  (Id. ¶¶ 2-3.)  As a result of this incident, jail security was called into the medical unit.  (Id. ¶ 4.)  Jail security included Defendants Santacroce, Walsh, Losee, Olsen, and Quinones.  (Id. ¶¶ 7–21).  Multiple Defendants informed Plaintiff-Decedent that she needed to remove her braids from her hair because they represented a security risk.  Plaintiff-Decedent was disrespectful to Defendants.  (Id. ¶¶ 15-16.)  Plaintiff-Decedent was placed in handcuffs and escorted from the medical unit on the first floor to the female property unit on the fifth floor using an elevator.  (Id. ¶¶ 17-18.)  The parties dispute which Defendants escorted Plaintiff-Decedent.    Defendant claims that only Defendants Santacroce, Walsh, and Quiniones escorted her.  (Id. ¶¶18-19.)  Plaintiff claims that Santacroce, Walsh, Losee, Olsen, and Quinones all were involved in the escort, citing to Defendants' response to interrogatories and an incident report produced by Defendants.[1]  (Id.)  During the escort, Plaintiff was in a severely agitated state, unruly, attempted to kick Santacroce, and threatened to kill one of the corrections officers.  (Id. ¶¶ 23-26.)  Plaintiff claims that while in the elevator during the transport, Defendants assaulted Plaintiff-Decedent.  Specifically, Plaintiff claims that they beat up

---

[1] In response to interrogatories, Defendants stated that "[u]pon information and belief, the following individuals were present with plaintiff on January 15, 2015 at or around the time she was escorted from the Medical Unit: C.O. Wayne Losee, Nurse Rena Walker, Inv. John Santacroce, SERT Officers Quinones and Walsh and SGT Olsen." (See ECF No. 50-18, Pl. Ex. 5 at 3; see also ECF No. 50-19 Pl. Ex. 6(b).)  An incident report signed by Santacroce and produced by Defendants states that Plaintiff-Decedent was escorted "from the Medical Unit to the 5th floor by SERT officers Quinones #1324 and Walsh #1272 along with Sgt Olsen." (ECF No. 50-19, Pl. Ex. 6(a).)

Plaintiff-Decedent, kicked her, hit her, and pulled her braids out of her head.  (Id. ¶¶ 41, 52.) The incident allegedly caused physical injuries to Plaintiff-Decedent's head, scalp, wrists, arm, shin, and knees.  (Id. ¶ 42).  Defendants dispute this version of events, claiming excessive force was not used against Plaintiff-Decedent and argue that no admissible testimony exists to substantiate the allegations.  (Def. 56.1 Statement ¶¶ 21–28; Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Def. Reply") at 5).)  Plaintiff-Decedent told two other minors incarcerated in her unit, Brooke Lorenz and Algina Vallon, about the assault.  (Pl. 56.1 Statement at ¶ 28.)

Defendant Santacroce wrote an "Incident Report and a Notice of Charges and Basis for Disciplinary Actions Report" based on the incident, and Losee also wrote an incident report.  (Id. at ¶¶ 31-32.)  After the incident, Plaintiff-Decedent was placed in "lock-in" in the minor tier, which is a cell designated for inmates who had been disciplined.  Plaintiff was also required to be cuffed and shackled when she left her housing unit.  (Id. at ¶¶ 31, 38.)  Plaintiff was charged with: threatening to kill a corrections officer, failing to comply with an order to be quiet and stop verbally abusing the medical staff, and attempting to kick an officer.  (ECF No. 50-10, Def Ex. I.)  At a disciplinary hearing on January 19, 2015, Plaintiff-Decedent pled guilty with explanation to the charges and was sentenced to 60 days disciplinary lock-in, from the date she was put in lock-in, January 15, 2015, to March 16, 2015[2].  (Id. at ¶ 33; see ECF No. 50-10, Def Ex. I.)  At their depositions, Lorenz and Vallon stated that while Plaintiff-Decedent was in lock-in the other minors in her housing unit spent time with her by her cell, conversed with her from the common area of the tier, played cards with her, and gave her snacks and items from the commissary.  (Id. at ¶ 50.)

Defendants have moved for summary judgment on all claims.

---

[2] Plaintiff-Decedent was released from the Suffolk County Correctional Facility on February 12, 2015.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Konikoff v. Prudential Ins. Co. of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" <u>Marvel Characters</u>, 310 F.3d at 286 (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 587 (internal quotation marks and citation omitted). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See <u>Shannon v. New York City Transit Auth.</u>, 332 F.3d 95, 99 (2d Cir. 2003). Unless

the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate.  Anderson, 477 U.S. at 249.

### III. DISCUSSION

For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

### A. Claims Two Through Four

In her opposition, Plaintiff states that she does not oppose summary judgment as to the second (deliberate indifference), third (deprivation of liberty), and fourth (sex discrimination) causes of action.  For this reason, Defendants' motion for summary judgment on these claims is granted.

### B. Excessive Force Claim

Defendants argue that Plaintiff's excessive force claim must be dismissed because it is not supported by any admissible evidence in the record.  (Def. Mem. at 3-4.)  Defendants argue that Plaintiff-Decedent passed away before she could be deposed to tell her version of events, and that the statements she made to two fellow inmates who were also housed in the minor tier, Brooke Lorenz and Algina Vallon, and to Plaintiff, on a phone call regarding the incident, are inadmissible hearsay.  (Id. at 6-11.)  Plaintiff argues that the deposition testimony of Lorenz and Vallon regarding Plaintiff-Decedent's statements to them are admissible under the excited utterance exception, and the statements made to Plaintiff are admissible under Federal Rule of Evidence 807.  (Pl. Mem. at 7-10.)   For the reasons set forth below, the Court finds that the statements to Lorenz and Vallon are admissible under the excited utterance hearsay exception, and therefore, summary judgment as to this claim must be denied.

1.  <u>Statements to Lorenz and Vallon</u>

At her deposition, Lorenz testified that in December or January, Plaintiff-Decedent was called down to medical and when she returned, she was being escorted by corrections officers and was "hysterically crying."   (ECF No. 50-14, Pl. Ex. 1, ("Lorenz Dep.") at 36, 38, 74.)  Lorenz testified that she and the other two girls housed in the unit ran to the front of Plaintiff-Decedent's cell, "trying" to ask her, "what was wrong, what was wrong," as Plaintiff-Decedent was hysterically crying.  (<u>Id.</u> at 38.)  Lorenz testified that Plaintiff-Decedent told her that: in the medical unit she was ordered to take her braids out of her hair and that when she refused, jail security and the SWAT team were called, and that several male corrections officers then put her into the elevator where they "beat her up."  (<u>Id.</u> at 38-39, 42.)  Plaintiff-Decedent told Lorenz that "Santacruz [sic] ripped out her braids."  (<u>Id.</u> at 42.)   Plaintiff-Decedent also told Lorenz that the officers "threw her on the ground" and kicked her.  (<u>Id.</u> 42.)  Plaintiff-Decedent showed Lorenz two "bald and reddish spots" where the braids had been.  (<u>Id.</u> at 39-40.)  Lorenz testified that she saw bruises on Plaintiff-Decedent's knee, her shin, her right upper arm and both of her wrists.  (<u>Id.</u> 39, 41, 49.)

Vallon testified that while she was housed on the minor tier, Plaintiff-Decedent was led into the unit by a "whole bunch" of SERT team officers.  (ECF No. 50-15, Pl. Ex. 2, ("Vallon Dep." at 30, 33.).  Vallon could not recall what date the incident happened but that it was during Plaintiff-Decedent's intake to the jail.  (<u>Id.</u> at 29-30.)  Vallon testified that when she spoke to Plaintiff-Decedent, her face was red and that she was crying.  (<u>Id.</u> at 35.)  Vallon testified that she and the other girls were "comforting" Plaintiff-Decedent, who was "upset," "shooken up," and "shaking a lot." (<u>Id.</u> at 41, 49, 50.)  Plaintiff-Decedent told her that the SERT team officers and corrections officers had ripped her braids out in the elevator.  (<u>Id.</u> at 37.)  Plaintiff-Decedent told her that when they ripped her braids out, she "couldn't do anything about it because she was

shackled, she had cuffs on and the cuffs were really tight."  (Id.)  Vallon testified that Plaintiff-Decedent had red bald spots on her head.  (Id. at 35, 37.)  She also testified that she also saw "red ring around [Plaintiff-Decedent's] wrist where the bracelet was on both arms."  (Id. at 37.)

    2.  Standard

    An "excited utterance" is recognized as an exception to the hearsay rule.  An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. Rule 803(2).  "An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)."  United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998) (finding that descriptions of the declarant's demeanor as "all hyped" and "nervous" sufficed to apply the exception, even though three hours had elapsed between the startling event and the declaration); see also United States v. Scarpa, 913 F.2d 993 (2d Cir. 1990) (finding there was "little doubt" that declarant's statements were made "under the stress of excitement" because witnesses claimed defendant was "very nervous" and "beaten up" while delivering the declaration five or six hours after he was beaten.)  The rationale for the exception is that the "excitement of the event limits the declarant's capacity to fabricate a statement and therefore offers some guarantee of its reliability."  Id. at 127.  "Several factors may be considered in determining whether a speaker was under the stress of excitement, including: the nature of the event, [t]he time that lapsed between the startling event and the statement, the physical and psychological distance of the speaker from the startling event, and the appearance or demeanor of the speaker, as well as his behavior or condition."  Zalewski v. City of New York, No. 13-CV-7015, 2019 WL 8324447, at *2 (E.D.N.Y. Dec. 18, 2019).

3.  <u>Application</u>

Here, Defendants argue that the excited utterance does not apply to Lorenz and Vallon's testimony because "the testimony of these individuals lacks the specificity necessary as to the date and time these statements were purportedly made to them."  (Def. Mem. at 10.)  Specifically, Defendants argue that because Lorenz and Vallon could not recall the specific date or time that Plaintiff-Decedent made these statements at their depositions, the statements therefore cannot meet the temporality requirement.  However, the relevant factor is not what date the declarations occurred but the <u>time elapsed</u> between the startling event and declaration.  Here, while Lorenz and Vallon, two incarcerated minors, do not recall the exact date or time that they spoke to Plaintiff-Decedent, it is clear from their depositions that Plaintiff-Decedent made these statements soon after she was released from the custody of the corrections officers who allegedly assaulted her. Their depositions are also clear that at the time Plaintiff-Decedent made these statements she was visibly upset, crying, and shaking.  Furthermore, Plaintiff's opposition brief clarifies that certain timestamps from the Suffolk County Correctional Facility suggest that Plaintiff-Decedent made the statements at issue within two hours of the alleged assault.  (Pl. Mem. at 10.)

Defendants also argue that the excited utterance exception does not apply because "the substance of these statements [lack] anything identifying the named defendants as the perpetrators of the alleged excessive force." (Def Mem. at 10.)  First, Lorenz's testimony does identify Santacroce as the person who ripped out Plaintiff-Decedent's braids, despite his name being spelled incorrectly.  (Lorenz Dep. at 42-43.)  Second, there is other evidence in the record stating that Defendants were the ones who escorted Plaintiff-Decedent from the medical unit—an incident report signed by Santacroce and responses to interrogatories from Defendants themselves—and

Plaintiff does not need the testimony of Lorenz or Vallon to establish this.  Accordingly, this argument is meritless.

The Court finds that the statements to both witnesses are admissible under the excited utterance exception, and therefore, there are genuine issues of material fact that preclude summary judgment as to the excessive force claim.[3]

## C.  Claim Five: Due Process Claim

Plaintiff's fifth cause of action alleges that "Defendants violated the rights of [Plaintiff-Decedent] guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 in that they subjected a minor to solitary confinement as a punishment for a disciplinary infraction even though she had not been convicted of any offense."  (Compl. ¶¶ 38-39.)   In her opposition, Plaintiff specifically argues that Suffolk County violated Plaintiff-Decedent's due process rights because: (1) Suffolk County policy authorized Defendant Santacroce to order that Plaintiff-Decedent be put in lock-in from the time of the incident until her hearing four days later and that she be shackled and cuffed when leaving her housing area, and (2) Suffolk County policy allowed for the 60-day lock-in punishment to be imposed on Plaintiff-Decedent based on false charges even though she was a minor and mentally ill.  (Pl. Mem. 13-14.) Plaintiff argues that Suffolk County is liable under a Monell theory and points to a page in what she refers to as the "inmate manual" that states:

> Disciplinary sanctions may vary from verbal warning up to confinement in a specialized disciplinary housing unit designed to manage or affect negative behaviors that seriously threaten facility safety and security or the health, safety or well-being of facility staff or other inmates . . . if your behavior has caused an immediate threat to safety and security of others or towards the facility, you may be locked in Administrative Segregation pending your disciplinary hearing. Repeated violations will automatically be considered the higher class of infraction.

---

[3]  Because the Court finds the testimony of Vallon and Lorenz precludes summary judgment on this claim, the Court does not need to reach the question of whether Plaintiff's testimony about Plaintiff-Decedent's phone call regarding the incident would be admissible under Rule 807.

(ECF No. 50-19, Pl. Ex. 6(g).)  It is not clear from Plaintiff's TAC or the opposition briefing which individual defendants she intends to bring this claim against—the only individual defendant she mentions in this section is Santacroce.  The Court assumes that the only individual defendant she intends to bring this claim against is Santacroce.

1.  <u>Substantive Due Process</u>

"Pretrial detainees retain a liberty interest in avoiding restrictions or conditions of confinement that 'amount to punishment of the detainee.'"  <u>Washington v. Falco</u>, No. 20-CV-3009, 2021 WL 797658, at *4 (S.D.N.Y. Mar. 1, 2021) (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)).  "[I]n assessing whether restrictions on pretrial detainees comport with substantive due process, 'a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'"  <u>Almighty Supreme Born Allah v. Milling</u>, 876 F.3d 48, 55 (2d Cir. 2017) (quoting <u>Wolfish</u>, 441 U.S. at 538).  "Absent proof of intent to punish, 'that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.'"  <u>Id.</u> (quoting <u>Wolfish</u>, 441 U.S. at 538).  Accordingly, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees."  <u>Id.</u> (quoting <u>Wolfish</u>, 441 U.S. at 539).  "[A] pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 398 (2015).  However, it is well settled that "the government has a legitimate interest in the security of prisons, and that prison officials should be afforded deference in the adoption and

11

execution of policies and practices . . . needed to preserve internal order and discipline and to maintain institutional security." Allah, 876 F.3d at 55.

### i. Claim Against Santacroce

Plaintiff was sentenced to 60 days in lock-in and ultimately was in lock-in from January 15, 2015 to February 12, 2015 when she was released from jail.  Lorenz and Vallon testified at their depositions that while Plaintiff-Decedent was in lock-in, the other minors in her housing unit spent time with her by her cell, conversed with her from the common area of the tier, played cards with her, and gave her snacks and items from the commissary.

Defendants argue that Plaintiff-Decedent was put in lock-in for the safety of the other inmates and staff based on the charges against Plaintiff-Decedent for:  threatening to kill a corrections officer, failing to comply with an order to be quiet and stop verbally abusing the medicals staff, and attempting to kick an officer.  (Def. Ex. I, ECF No. 50-10.)  Plaintiff argues that Plaintiff-Decedent's confinement in lock-in both before and after the disciplinary hearing was not related to a legitimate interest.  First, Plaintiff argues that a jury could infer from the testimony of Vallon and Lorenz about the assault that Santacroce put Plaintiff-Decedent in lock-in based on "trumped-up" charges in an effort to cover Defendants' tracks following the assault.   Second, Plaintiff argues that the lock-in could not be related to the legitimate interest of safety because at Santacroce's deposition he stated that the corrections officers thought Plaintiff-Decedent's behavior "was funny . . . she is a small girl." (Santacroce Dep. 34, ECF No. 50-17.)  Third, Plaintiff argues that the 60-day lock-in sentence of a minor with mental illness was an "an arbitrary, or disproportionate sanction . . . that furthers no legitimate penological objective [and] constitutes punishment (and, thus, is proscribed by the Fourteenth Amendment)."  See Bell, 441 U.S. at 538–39.

12

The Court finds that based on the undisputed facts, there was a legitimate purpose for placing Plaintiff-Decedent in lock-in—namely, the safety and security of the other people in the jail.  The Second Circuit has held that "measures similar to Administrative Segregation [do] not violate substantive due process where prison officials subjected pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the measures were not excessive in relation to that purpose."  Allah, 876 F.3d at 55–56; see also Wolfish, 441 U.S. at 561 ("Ensuring security and order at the institution is a permissible nonpunitive objective").

First, Plaintiff-Decedent pled guilty with explanation to the charges of threatening to kill a corrections officer, refusing to stop verbally abusing medical staff, and attempting to kick a corrections officer.  Plaintiff argues that these charges were false or "trumped up" but points to no evidence in the record showing that the charges were false.  Rather, Plaintiff-Decedent pled guilty to the charges at the disciplinary hearing.  Moreover, neither the testimony of Vallon and Lorenz nor the recording of the phone call between Plaintiff-Decedent and Plaintiff raise a question of fact as to whether Santacroce lied when he reported that Plaintiff-Decedent: threatened to kill a corrections officer, failed to comply with an order to be quiet and stop verbally abusing the medicals staff, and attempted to kick an officer.[4]

Plaintiff also points to Santacroce's testimony that the corrections officers laughed at Plaintiff-Decedent's behavior as evidence that the sentence was unrelated to a legitimate purpose or excessive.  The Court finds this is insufficient to show that the sentence of lock-in was unrelated to the safety and security of the jail, including both the corrections officers and fellow inmates.

---

[4]  While the deposition testimony of Lorenz and Vallon are sufficient to raise a material factual dispute with respect to Plaintiff's excessive force claim, Plaintiff points to nothing in either that deposition testimony or the phone recording that addresses the three factual allegations that were the basis for Plaintiff's disciplinary charges.

The Court also finds that, the sentence of lock-in was not excessive in relation to the charges against Plaintiff-Decedent and the legitimate purpose of keeping the other people in the jail safe.  See Cabral v. Strada, 513 Fed. Appx. 99, 103 (2d Cir. 2013) (rejecting substantive due process claim where pretrial detainees were placed in segregated housing unit after prison officials received reports from confidential informants that, inter alia, a "green light" had been issued by rival gang members to physically attack the detainees on sight in the prison); Adams v. Galletta, No. 96-CV-3750, 1999 WL 959368, at *4 (S.D.N.Y. Oct. 19, 1999) (finding pretrial detainee was not deprived of liberty interest where plaintiff was housed in maximum security and records reflected that it was imposed because of the plaintiff's possible escape status and there was no evidence of any punitive intent); Cf. Allah, 876 F.3d at 56 (finding that a pretrial detainee's due process rights were violated because "[p]rison officials did not  . . . make an individualized or specific finding of the risk that [inmate] may have presented  . . . or any real determination or individualized assessment that Administrative Segregation was appropriate for [inmate] during that time period.").  Additionally, the fact that Plaintiff-Decedent was a minor with a mental illness also does not render the sentence of lock-in excessive or a violation of due process.  In reaching this conclusion, it is notable that while Plaintiff-Decedent was placed in lock-in, during that time, she was still able to converse with the other minors in her housing tier, play cards with the other minors, and get snacks and items from the commissary from the other minors.  (Def. 56.1 Statement at ¶ 50.)

Furthermore, the Court fails to see how the two claims discussed above concerning the propriety of the sentence Plaintiff-Decedent received at the hearing can even brought against

Santacroce, who did not decide Plaintiff's sentence, and, thus, lacks sufficient personal involvement to be sued on such claims[5].

Finally, although Defendants do not raise qualified immunity in their summary judgment briefing[6], the Court finds that Santacroce would also be entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted).  Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743 (internal quotation marks omitted).

In Allah, the Second Circuit found that the plaintiff's due process rights were violated where the plaintiff, a pretrial detainee, was placed in administrative segregation based upon only fact that he had previously been assigned to administrative segregation during his prior term of incarceration and "had not completed the program." Allah, 876 F.3d at 58–60.  However, the Second Circuit explained that the defendants were entitled to qualified immunity because although "Wolfish and its progeny put prison officials on notice that pretrial detainees have a substantive

---

[5]  With regard to the pre-hearing lock-in, it is not clear who made the decision to place Plaintiff-Decedent in lock-in prior to the hearing.  The parties' 56.1 statements do not say who made that decision.  Defendants Santacroce and Losee both wrote incident reports regarding the incident addressed to a Lieutenant Schneider.  The notes on both reports state that Plaintiff-Decedent was placed in lock-in pending the disciplinary hearing.  (ECF No. 50-19, Def. Ex. 6.)  Plaintiff's opposition brief argues that Santacroce made this decision "unilaterally" but does not point to any evidence in the record showing that.

[6]  Defendants did raise qualified immunity as a defense in their answer to the TAC.  (ECF No. 29 at ¶¶ 28-31; 33.)

due process right not to be subjected to restrictions amounting to punishment . . .," the general principal in <u>Wolfish</u> did not clearly establish that a substantive due process violation would result from the plaintiff's placement in administrative segregation in those circumstances.  <u>Allah</u>, 876 F.3d at 48.  The Second Circuit found that "neither <u>Wolfish</u> nor any subsequent decision has prohibited the confinement of pretrial detainees under the conditions imposed here if those conditions are imposed upon an individualized finding that a particular detainee poses a threat to security." <u>Id.</u>  Similarly here, the Court finds that <u>Allah</u>, <u>Wolfish</u>, and their progeny do not clearly establish that placing Plaintiff-Decedent in lock-in based on the charges against her would result in a due process violation.  It is also notable that <u>Allah</u> was decided in 2017—two years after the events in question here, which further establishes qualified immunity.  With regard to the argument that Santacroce falsified or trumped up the charges, the Court also finds that qualified immunity would apply.  <u>See Ismael v. City of New York</u>, No. 17-CV-1825, 2018 WL 4757950, at *4 (S.D.N.Y. Sept. 28, 2018) (finding qualified immunity applied and that plaintiff had "no 'clearly established right' to be free of a false accusation" where the plaintiff alleged that corrections officer made false allegations against him that resulted in a hearing at which his good time credits were revoked).

Accordingly, the Court finds that Defendants are entitled to summary judgment on this claim.

### ii. *Monell Claim*

The Court next considers whether Plaintiff's <u>Monell</u> claim survives summary judgment. It is well-established that a municipality, such as Suffolk County, may be liable under Section 1983 only if the plaintiff proves that "action pursuant to official . . . policy of some nature caused a constitutional tort."  <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978);

see also Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004).  To establish the existence of a municipal policy or custom, the plaintiff must establish (1) the existence of a formal policy officially endorsed by the municipality, (2) actions taken or decisions made by an official with final decision making authority, (3) a practice so persistent and widespread that it constitutes a custom, or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to a "deliberate indifference" to the rights of those who come in contact with the municipal employees.  Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002).

First, Plaintiff's Monell claims fail because Plaintiff has not established any underlying constitutional violations.  Second, Plaintiff's Monell claim fails because the record does not contain evidence from which a reasonable jury could find that the alleged violations of Plaintiff-Decedent's rights were the result of a policy, practice, or custom of Suffolk County.  The policy that Plaintiff-Decedent cites allows for "confinement in a specialized disciplinary housing unit designed to manage or affect negative behaviors that seriously threaten facility safety and security or the health, safety or well-being of facility staff or other inmates." (ECF No. 50-19, Pl. Ex. 6(g).) Plaintiff's substantive due process claim against Santacroce relies on the arguments that Santacroce submitted false charges against Plaintiff-Decedent, that the corrections officers did not believe she was actually a threat, and that lock-in was excessive because she was a minor/mentally ill.  This policy clearly does not endorse placing an inmate in lock-in based on false charges, where there is not actually a safety concern, or where lock-in would be excessive.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's substantive due process claims.

2.  Procedural Due Process

"Pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause. Washington, 2021 WL 797658, at *7 (citing Bell v. Wolfish, 441 U.S. at 535).  When a restriction is placed on a pretrial detainee for disciplinary reasons, "[p]rocedural due process requires that a pretrial detainee be given written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence before being subjected to punitive as opposed to administrative measures." Allah, 876 F.3d at 55 n.3 (internal quotations omitted).  However, when a restriction is imposed for nonpunitive or administrative reasons, a pretrial detainee is entitled only to "receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to impose the restraint." Taylor v. Santana, 2007 WL 737485, at *4 (S.D.N.Y. 2007) (internal citations omitted), aff'd sub nom. Taylor v. Comm'r of N.Y.C. Dept. of Corrs., 317 F. App'x 80 (2d Cir. 2009).  A restriction is administrative if it "is employed to achieve a legitimate government interest, such as protecting the safety of the individual or the general prison population." Id.  For a non-punitive restriction, "officials may afford process after the imposition of the restraint-as long as the process occurs within a reasonable time." Id. at 4.

Here, Plaintiff does not dispute that:  (1) Plaintiff-Decedent was given written notice of the charges against her; (2) a hearing at which she pled guilty with explanation to the charges; and (3) a written statement of the disposition which was "based on officers report and inmate statement."  (Pl. 56.1 Statement at ¶¶ 31, 33.)  Plaintiff does not argue that the hearing was deficient.  Instead, Plaintiff argues because Plaintiff-Decedent was placed in lock-in for four days prior to the hearing, her procedural due process rights were violated.  As explained above, the

Court finds that there was a nonpunitive purpose for placing Plaintiff-Decedent in lock-in—the safety and security of the other inmates and personnel at the jail.  When there is a nonpunitive purpose, "officials may afford process after the imposition of the restraint as long as the process occurs within a reasonable time."  Taylor, 2007 WL 737485, at *4.  Plaintiff-Decedent received notice of the charges against her, a hearing within four days of the incident, and a written statement of disposition.  Accordingly, the Court finds that summary judgment on this claim is warranted.

Plaintiff also argues that the County is liable for the four-day period of punishment, under a Monell theory, because "it authorized Santacroce to impose this punishment on [Plaintiff-Decedent] unilaterally" prior to the hearing.  (Opp. at 13.)  The jail policy at issue states that "if your behavior has caused an immediate threat to safety and security of others or towards the facility, you may be locked in Administrative Segregation pending your disciplinary hearing." Plaintiff's Monell claim fails because Plaintiff has not established any underlying constitutional violations since the purpose of the lock-in was not punitive.  Plaintiff's Monell claim also fails because, even if Plaintiff's pre-hearing lock-in was punitive, Plaintiff's evidence does not establish that this was a result of any custom or policy of Suffolk County.

The policy Plaintiff cites states that "if your behavior has caused an immediate threat to safety and security of others or towards the facility, you may be locked in Administrative Segregation pending your disciplinary hearing."  That policy, on its face, is in accordance with the requirements of procedural due process because it only permits pre-hearing lock-in if the inmate's behavior constitutes an immediate threat to safety and security of others or towards the facility.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's procedural due process claims.

**D**. **Individual Defendants**

Finally, Defendants move to dismiss claims against certain individual defendants.

First, Defendants move to dismiss any claims against Defendant Nurse Rena Walker. Defendants note that because Walker was named for the first time in the TAC, the statute of limitations for any claim against her has expired, and she was never served with the TAC nor has she waived service. Moreover, there is not a cognizable constitutional claim alleged against her in the TAC and no evidence in the record indicates that any constitutional violation occurred. (Def. Mem. at 3.) Plaintiff does not respond to this argument or even mention Walker in her opposition to the summary judgment motion. Accordingly, the Court finds that Plaintiff has abandoned any claim against Walker, and any claim against Walker is dismissed. See Blake v. Race, 487 F. Supp. 2d 187, 217 (E.D.N.Y. 2007) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.").

Second, Defendants ask the Court to dismiss Defendants Olsen and Losee because "there is no admissible evidence in the record to indicate they were present for the escort on January 15, 2015" or participated in any constitutional violations. (Def. Mem. at 11.) However, as Plaintiff points out, there is evidence in the record that Olsen was present for the escort from the medical unit and that Losee was present "at or around the time she was escorted from the Medical Unit," namely the incident report and Defendants' own responses to the interrogatories. (See ECF No. 50-18, Pl. Ex. 5; ECF No. 50-19, Pl. Ex. 6.) Lorenz also testified that the officers that were in the elevator with Plaintiff-Decedent beat her up and hit her. (See Lorenz Dep. at 38-39.) There is at least a question of fact as to whether these Defendants were present for the escort and were involved in the assault, and therefore the Court declines to dismiss them from the case.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants summary judgment as to the following claims:  deliberate indifference to Plaintiff-Decedent's medical needs in violation of the Fourteenth Amendment; deprivation of liberty under the Fourteenth Amendment; sex-based discrimination under the Fourth and Fourteenth Amendments; and Due Process violations under the Fourteenth Amendment. Because Defendants' summary judgment motion on the due process claim is granted, Suffolk County and the Suffolk County Sheriff's Department are dismissed from the case.  The Court also dismisses individual Defendant Walker from the case.  The Court denies summary judgment as to the excessive force claim against the other individual defendants.

**SO ORDERED.**

Dated:  March 11, 2022
        Central Islip, New York

                                           /s/ (JMA)
                                         JOAN M. AZRACK
                                         UNITED STATES DISTRICT JUDGE