UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   For Online Publication Only
BARBARA COSTANZO,
*as legal successor of Irena Costanzo*,

                                  Plaintiff,                **FINDINGS OF FACT &**
                                                        **CONCLUSIONS OF LAW**
                                                        16-CV-03871 (JMA) (ARL)
              -against-                                         **FILED**
                                                               **CLERK**

                                                         10:09 am, Jun 29, 2023

INVESTIGATOR JOHN SANTACROCE,                        **U.S. DISTRICT COURT**
CORRECTION OFFICER WAYNE LOSEE,               **EASTERN DISTRICT OF NEW YORK**
SERT OFFICER QUINONES,                                       **LONG ISLAND OFFICE**
SERT OFFICER WALSH, and SGT. OLSEN,

                                  Defendants.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Barbara Costanzo ("Plaintiff" or "Barbara"), as legal successor of her deceased daughter, Irena Costanzo ("Irena"), brings this action against Lieutenant Scott Walsh, Sergeant Richard Olsen, and Corrections Officers ("COs") John Santacroce, Wayne Losee, and Steven Quinones (collectively, "Defendants"), alleging that Defendants used excessive force against Irena in connection with an incident that took place on January 15, 2015 while Irena was incarcerated at the Suffolk County Correctional Facility ("SCCF") in Riverhead, New York.

      The Court held a bench trial on February 27 and 28, and March 15, 2023. Losee was dismissed from the case, on the parties' agreement, following his testimony at trial. Now, based on the Court's evaluation of the trial testimony—including the credibility of the witnesses—and the evidence introduced at trial, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). For the following reasons, the Court

concludes that Plaintiff has failed to meet her burden of proving her excessive force claim by a preponderance of the evidence.[1]

## I. FINDINGS OF FACT

### A. Background

Irena's mother, Barbara, testified that it was apparent from an early age that Irena struggled with her mental health, including depression and anxiety. (Tr. I 182:22–183:7.)[2] Although Irena had friends and performed well in school, by the time she was 13 or 14 years old, she was also suffering from substance abuse issues. (Tr. I 184:6–23, 186:1–5.) As Irena grew older, she began abusing prescription medication, including oxycodone, Xanax, and later, heroin. (Tr. I 222:1–224:6.) Barbara repeatedly sought mental health and substance abuse treatment for Irena, but no course of treatment was successful—Irena would relapse once she arrived home. (Tr. I 186:1–5.) Barbara and her husband, Richard Costanzo, Irena's father, fell into debt as they paid out-of-pocket for Irena's litany of treatment programs. (Tr. I 186:6–10.) As the director of a mental health program that offers substance abuse treatment for adults, Barbara knew that Irena needed long-term treatment to combat her addiction. (Tr. I 186:11–17.)

---

[1] After the parties rested their cases, Plaintiff moved pursuant to Federal Rule of Civil Procedure 15(b) to conform the Third Amended Complaint, (ECF No. 27), to the evidence adduced at trial. (Pl.'s Rule 15 Mot., ECF No. 68.) Specifically, Plaintiff sought to add two claims, both pursuant to 42 U.S.C. § 1983, based on (i) Defendants' "failure to intervene, to stop, or otherwise hinder the use of excessive force against Irena Costanzo," and (ii) their actions to "conceal[] and otherwise cover[] up the use of excessive force against Irena Costanzo." (Id. at 1.) Notably, however, Plaintiff acknowledged that "[b]oth of these alternative theories of liability are dependent upon a finding by the Court that such excessive force was used by one or more of the defendants." (Id.) Because the Court finds that Plaintiff has not proven her underlying excessive force claim by a preponderance of the evidence, her Rule 15 motion is denied as moot.

[2] Citations to "Tr." refer to the corresponding pages and lines of the transcripts of the bench trial held on February 27 and 28, and March 15, 2023. Because the trial transcripts are not paginated consecutively, the Court has used the following naming convention: "Tr. I" refers to the transcript for February 27, 2023; "Tr. II" refers to the transcript for the morning of February 28, 2023; "Tr. III" refers to the transcript for the afternoon of February 28, 2023; and "Tr. IV" refers to the transcript for March 15, 2023. Additionally, citations to "PX" and "DX" refer to exhibits offered by Plaintiff and Defendants, respectively, and admitted into evidence at trial.

Desperate, and feeling that she had exhausted all other options, Barbara obtained a "refrain from" order from a family court judge in the fall of 2014. (Tr. I 187:15–16.) In sum and substance, the refrain from order prohibited Irena from possessing any drugs or drug paraphernalia at home, and provided that she could be arrested and sent to jail if she violated the order. (Tr. I 187:5–14.) Irena was aware of the order's terms, and according to Barbara, she "understood that this is what needed to happen," because "[s]he knew she needed help." (Tr. I 187:19–22.)

Soon after Barbara obtained the refrain from order, in December 2014, she found glassine bags in Irena's pocketbook and reported to the police that Irena had violated the terms of the order. (Tr. I 187:23–188:3.) The police came to the Costanzos' home and arrested Irena. (Tr. I 188:4–5.) Irena remained in jail for "a few days," until a judge ordered her release. (Tr. I 188:6–15.) Barbara hoped that she would be sent to a long-term inpatient substance abuse treatment program, but this plan collapsed after Barbara's health insurance provider refused to cover the program's cost. In the interim, Irena was sent to an outpatient treatment program. (Tr. I 193:12–194:22.)

Irena's release was short-lived. Approximately one month later, in January 2015, Barbara again found drugs in Irena's possession. Barbara called the police, and Irena was arrested and taken to SCCF. (Tr. I 191:1–8.)

**B.** **The Events of January 15, 2015**

The following witnesses testified regarding the events of January 15, 2015: Barbara; Algina Vallon, Brooke Lorenz, and Kristen Brophy, all of whom were incarcerated with Irena on SCCF's minor tier, the housing unit for inmates under 18 years old; and Defendants Wayne Losee, Steven Quinones, Richard Olsen, Scott Walsh, and John Santacroce.[3]

On January 15, 2015, Irena—then 17 years old—arrived for intake at SCCF. (Tr. I 191:1–

---

[3] Santacroce did not testify at trial. Instead, the Court permitted Defendants to introduce the transcript of his August 22, 2018 deposition, (DX G), under Fed. R. Civ. P. 32(a)(4)(C). (Tr. III 75:19–77:4.)

2; PX 7, PX 8 at 1.) She had braids with colored strings or ribbons woven into the back of her hair. (Tr. I 188:16–189:21, 190:11–20, 191:14–192:4.)

### 1. Events in the Medical Unit

Losee was at his post in the medical unit on SCCF's first floor when, at approximately 4:00 p.m., Irena exited a nurse practitioner's office. (Tr. II 42:16–25, 48:3–17; PX 8.) She was wearing a standard-issue green inmate uniform. (Tr. II 107:20–108:18; Tr. III 26:19–22.) Losee testified that she appeared "very angry" and "agitated," and as she walked towards him, "[s]he was saying 'fuck that doctor, fuck this place, I'm not listening to her.'" (Tr. II 44:22–45:3.) When Losee attempted to calm Irena down, she "got in [his] face and said 'that stupid doctor, this cunt, fuck her, I'm not listening to her.'" (Tr. II 45:4–7.) Irena also said "something about hair bands" to him. (Tr. II 51:2–5.) Losee then instructed Irena to walk to the other side of the nurse's station and put her back against the wall until medical staff were ready to see her. (Tr. II 45:8–12, 48:24–49:9.) Although Irena walked "quietly" to the wall, Losee testified that she quickly "started in again," shouting and cursing. (Tr. II 45:13–15.) According to Losee, Santacroce—who was standing at the nurse's station—then tried to speak with Irena, but she continued cursing and "kept getting louder and louder." (Tr. II 51:6–16; PX 8.)

At that time, the Sheriff's Emergency Response Team ("SERT") was called to the medical unit to assist. (Tr. II 84:8–11, 101:25–102:17.) Quinones and Walsh, who were both assigned to SERT detail on the 3:00 p.m. to 11:00 p.m. shift, arrived in the medical unit approximately one to two minutes after Losee's initial interaction with Irena. (Tr. II 45:19–25, 52:25–53:5, 100:2–6, 103:1–4.) As SERT officers, they wore distinctive navy-blue uniforms. (Tr. II 90:1–9; Tr. III 16:17–19.) Olsen arrived at some point after Quinones and Walsh. (Tr. II 106:25–107:13.)

Quinones testified that when he arrived in the medical unit, Irena was facing a wall in front of the nurse's station. (Tr. II 106:3–7.) Irena "seemed agitated" and was being "verbally abusive"

4

towards Santacroce, calling him a "fucking asshole," among other insults. (Tr. II 106:7–12.) Quinones testified that he was not aware of why Irena was upset. (Tr. II 108:19–22.) Walsh also witnessed Irena's "verbally abusive" behavior. (Tr. III 24:24–25:23.) However, unlike Quinones, Walsh testified that he understood that Irena was angry because she had been ordered by Santacroce and medical staff to remove the braids from her hair. (Tr. III 20:25–21:21, 22:14–18, 24:19–21.) According to Walsh, SCCF policy required that Irena remove her braids because they were considered contraband and a security risk. (Tr. III 22:19–23:4.) Losee likewise noted in an incident report that Irena was upset because she had been ordered to remove her braids. (PX 8; DX J-6.)

Soon after, Olsen, Santacroce, Quinones, and Walsh decided to escort Irena from the medical unit to the female property unit on the fifth floor. (Tr. II 109:15–19, 111:22–25; Tr. III 26:5–7.) Walsh testified that female inmates who refused to turn over contraband would be taken to female property prior to being placed in their housing unit. (Tr. III 26:8–11.)

Losee did not see Irena again. (Tr. II 55:2–5.)

### 2. Transportation from the Medical Unit to Female Property

Upon leaving the medical unit, Irena was led by Olsen, Santacroce, Quinones, and Walsh down a corridor to SCCF's north lobby. (Tr. II 110:12–17; Tr. III 27:16–22.)

Santacroce and Walsh testified that Irena was handcuffed; Quinones could not recall whether she was handcuffed. (Santacroce Dep. Tr. 23:16–24:22; Tr. III 27:2–12; Tr. II 111:13–18.) At least one of Olsen, Santacroce, Quinones, or Walsh held onto Irena to guide her and prevent her from falling. (Santacroce Dep. Tr. 24:4–22; Tr. III 28:13–18.) Irena continued to be "verbally abusive" to Santacroce, "flail[ed] around," and attempted to pull away from her escort. (Tr. II 112:4–9; Tr. III 28:6–12; Santacroce Dep. Tr. 27:20–28:24, 38:14–20.) She also threatened to kill an unidentified individual. (Tr. III 28:6–12; DX J-5.)

5

Once in the lobby, Irena, Olsen, Santacroce, Quinones, and Walsh entered a gated waiting area outside the elevator. (Tr. II 110:18–111:1.) The elevator arrived and all five walked inside. (Tr. II 111:2–4.) There was no video camera inside the elevator. (Santacroce Dep. Tr. 60:6–9; Tr. III 38:17–39:7.)

Irena was placed facing the elevator's wwall. (Tr. II 112:9–10; Santacroce Dep. Tr. 31:24–25, 32:16–22.) Quinones or Walsh held her handcuffs. (Santacroce Dep. Tr. 32:23–25.) Irena continued to verbally abuse Santacroce, calling him "a fucking asshole, and a cunt, and a pussy," among other insults. (Tr. II 112:11–13.) While she was facing the elevator wall, she kicked back towards Santacroce but did not injure him. (Tr. II 112:14–18; Tr. III 28:8–12; Santacroce Dep. Tr. 31:24–33:3.) Santacroce testified that he, Olsen, Quinones, and Walsh "laughed about it." (Santacroce Dep. Tr. 34:19–22.)

According to Quinones, the elevator ride lasted five to ten seconds. (Tr. II 113:6–11.) Santacroce estimated that the elevator ride took no more than 20 to 35 seconds. (Santacroce Dep. Tr. 37:24–38:4.)

Once the elevator arrived at the fifth floor, the doors opened; Santacroce, Olsen, Quinones, and Walsh walked Irena to the female property unit, approximately 25 feet away. (Tr. II 110:12–112:19; Tr. III 44:4–8; Santacroce Dep. Tr. 42:19–25.) Walsh testified that Irena still had the braids in her hair when she was deposited at female property. (Tr. III 44:9–46:5; Santacroce Dep. Tr. 43:2–13.) Quinones and Walsh testified that she did not appear injured and did not complain of any injuries. (Tr. II 115:23–116:5; Tr. III 29:23–30:5.) According to Santacroce, Irena was still "yelling and screaming." (Santacroce Dep. Tr. 43:7–13.)

In total, it took approximately one to two minutes to transport Irena from the medical unit to female property. (Tr. II 111:9–12; Tr. III 27:23–25; Santacroce Dep. Tr. 38:5–13.) Santacroce, Quinones, and Walsh all testified that they did not use physical force against Irena—other than de

6

minimis force to guide her—during the escort from the medical unit and subsequent elevator ride. (Tr. II 114:14–115:12; Tr. III 29:7–18; Santacroce Dep. Tr. 27:2–43:6.)

Quinones and Walsh testified that Irena's verbally abusive behavior towards medical staff and Santacroce, as well as her kick towards Santacroce on the elevator, rendered her subject to disciplinary proceedings for violating SCCF's rules. (Tr. II 112:20–113:2; Tr. III 30:6–15.) In fact, Santacroce filed an incident report at 4:45 p.m. recommending that Irena "be placed in cuffs and shackles due to her aggressive behavior." (DX J-5; Santacroce Dep. Tr. 48:5–50:3.) Santacroce's recommendation was adopted, and a "cuff and shackle" order was later entered at 7:00 p.m. (DX E; Tr. II 136:3–137:6.) As a result, Irena was placed in handcuffs and shackles— with a "belly chain" connecting both sets of restraints—and forced to change from her standard green prison uniform to a red and white uniform, known as "red and whites." (Tr. II 133:25– 134:5, 137:2–8, 151:6–8.)

### 3. Arrival on the Minor Tier

Irena was escorted to her housing unit on the minor tier at approximately 6:20 p.m. (DX J-3; Tr. III 50:6–22, 53:4–11.) Vallon, Lorenz, and Brophy were in their cells when Irena arrived. (Tr. I 31:21–32:13.) Vallon testified that Irena was escorted by four men who "looked like a SWAT team" and were not "normal COs" because they had "extra gear," including vests. (Tr. I 33:24–34:11, 35:13–22.) Lorenz similarly testified that the men were "not regular COs," but rather "the people going when the inmates are having a problem," and that they wore black uniforms. (Tr. I 102:8–15.) Irena's ankles were shackled, and she wore a belly chain over her red and whites. (Tr. I 33:12–23, 34:12–16, 101:12–14, 103:20–23, 148:22–149:5.)

Once their cell doors were opened, Vallon, Lorenz, and Brophy exited their cells and walked to Irena's cell at the end of the cell block. (Tr. I 35:23–36:8, 102:16–23.) They found Irena sitting at the end of her bed, with her hands outside the cell's bars, "crying hysterically." (Tr.

7

I 36:9–37:22.) Irena told Vallon, Lorenz, and Brophy what happened inside the elevator.[4]

Vallon testified that Irena told them that "they had ripped out the thing in her hair," and that "she got attacked on the elevator." (Tr. I 38:22–39:3.)

Lorenz testified that Irena told them that "[s]he was in medical with the security, Santacruz[5] and the other security people, and she had these things in her hair. . . . like the strings that you braid in your hair," and that "they ripped them out of her head and beat her up in the elevator." (Tr. I 103:2–12.)

Brophy testified that Irena told them that "Santacruz" and others "beat [her] up in the elevator" and "ripped out" her braids. (Tr. I 148:2–19, 151:8–10.)

Irena bowed her head and showed where her braids had been removed. Vallon testified that she saw three dollar-coin-sized spots that were "really red" and appeared to be covered with "dried up blood." (Tr. I 38:9–40:1.) Lorenz saw "multiple bald spots on her head, at least four," as well as "bruises" on her legs and arms. (Tr. I 103:24–104:14, 105:20–22.) Brophy saw "chunks of hair missing" in "two or three" locations on her head that were "a little bigger than a quarter or so." (Tr. I 150:4–13.) Vallon testified that Irena's wrists were "[r]eally red, really, really red." (Tr. I 40:2–21.) Brophy also noted that Irena "show[ed] [them] her wrists and they were red and, like, chafed." (Tr. I 148:16–19.)

Lorenz testified that they told a female CO that Irena needed medical attention, but the CO did nothing. (Tr. I 106:4–12, 130:18–25.) Vallon, Lorenz, and Brophy did not request medical assistance for Irena from nurses who visited the minor tier. (Tr. I 128:1–21.)

---

[4] The Court previously ruled that Vallon's and Lorenz's testimony regarding Irena's statements was admissible under Federal Rule of Evidence 803(2) as excited utterances. (See Mem. & Order at 9–10, ECF No. 52.) Brophy's testimony regarding Irena's statements is admissible under Rule 803(2) for the same reasons.

[5] Santacroce was commonly known as "Santacruz." (Tr. II at 46:1–3, 105:18–23, 149:1–6.)

C.   **The Aftermath**

As a result of her behavior on January 15, 2015, Irena was subjected to disciplinary proceedings. She was confined to her cell on the minor tier for 23 hours a day; when she left her cell, she remained under the "cuff and shackle" order. (DX J-1, J-8, J-10; Tr. I 43:20–24, 209:18–210:2.) Lorenz testified that she observed Irena experience withdrawal during this time related to her heroin use. (Tr. I 137:25–138:6.)

At 9:38 p.m. on the following day, January 16, 2015, Barbara spoke to Irena by telephone. (Tr. I 196:4–11.) Irena told Barbara that "male cops" had put her into an elevator and "beat [her] up" and "ripped out all [her] hair" after she "told them the last time they let [her] keep the things in [her] hair." (DX B.)

Irena remained at SCCF through February despite the events of January 15. (Tr. I 210:9–12.) Barbara testified that she believed that she needed to "protect" Irena's younger sister from Irena's drug abuse. (Tr. I 242:2–13, 243:4–8.) In February, Irena was released to a court-mandated drug treatment program, but she relapsed soon after completing the program. (Tr. I 211:22–212:7.) She returned to SCCF in March, and she was released from SCCF for the final time on April 20, 2015. (Tr. I 212:8–18.)

Irena died from an accidental fentanyl overdose on October 18, 2016. (Tr. I 214:11–12, 224:7–225:12, 226:11–14.) She was 19 years old. (Tr. I 227:23–24.)

## II.   LEGAL STANDARDS

A.   **Standard of Proof and Credibility Assessments**

Plaintiff bears the burden of proving her Section 1983 claim by a preponderance of the evidence. Wallace v. Suffolk Cty. Police Dep't, 809 F. Supp. 2d 73, 80 (E.D.N.Y. 2011) (citing Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir. 1993)). The burden of proving a fact by the preponderance of the evidence "simply requires the trier of fact to believe that the existence of

9

a fact is more probable than its nonexistence." Gunter v. Long Island Power Auth./Keyspan, No. 08-CV-498, 2018 WL 10456421, at *5 (E.D.N.Y. Apr. 3, 2018) (quoting Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9 (1997)). Thus, "if the evidence is evenly balanced, the party with the burden of proof loses." Richardson v. Merritt, No. 12-CV-5753, 2014 WL 2566904, at *5 (E.D.N.Y. June 6, 2014) (quoting Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001)).

At a bench trial, "[a]ssessments of the credibility of the witnesses and the weight to be given to particular pieces of evidence are peculiarly within the province of the [district court] and are entitled to considerable deference." Tutt v. Moody, No. 18-CV-324, 2022 WL 17976820, at *3 (E.D.N.Y. Dec. 28, 2022) (quoting Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia), 134 F.3d 103, 104 (2d Cir. 1998)). "[A]s trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." Id. (quoting Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012)).

**B.     Excessive Force Claim**

Barbara asserts her excessive force claim pursuant to 42 U.S.C. § 1983, which "provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999) (citations omitted). "Analysis of a claim for use of excessive force begins with 'identification of the specific constitutional right allegedly infringed by the challenged application of force.'" Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) (brackets omitted) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). As relevant here, the Fourteenth Amendment's "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (internal quotation marks omitted). A pre-trial detainee bringing an excessive force claim

must therefore establish "that the force purposely or knowingly used against [her] was objectively unreasonable." Id. at 396–97. Additionally, the plaintiff must prove a defendant's personal involvement in the alleged constitutional deprivation to prevail on her claim. See Gutierrez v. New York, No. 18-CV-3621, 2021 WL 681238, at *5 (E.D.N.Y. Feb. 22, 2021) ("The 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.'" (quoting Victory v. Pataki, 814 F.3d 47, 67 (2d Cir. 2016))).

### III. CONCLUSIONS OF LAW

At trial, it was Plaintiff's burden to prove by a preponderance of the evidence that Defendants injured Irena by purposely or knowingly using objectively unreasonable physical force against her on January 15, 2015. In the Court's judgment, Plaintiff failed to meet this burden.

#### A. **Witness Credibility**

The evidence at trial established that there were, at most, five direct witnesses to the events that transpired on the elevator ride on January 15, 2015. Those witnesses were: Irena, who died in October 2016, before she could testify under oath in this case; Santacroce, whose deposition testimony was admitted in lieu of his live trial testimony under Federal Rule of Civil Procedure 32(a)(4)(C); Olsen, who testified at trial that he had no independent recollection of the events of January 15, 2015; Quinones; and Walsh. Irena also recounted her version of the elevator ride to the following witnesses who testified at trial: Vallon, Brophy, and Lorenz, who were incarcerated with her on the minor tier; and Barbara, her mother.[6] Unsurprisingly, as described above, the parties and their respective witnesses presented dramatically different versions of what happened during Irena's escort from the medical unit to the female property unit. The limited documentary evidence presented at trial sheds little light upon what transpired in that brief window. It is

---

[6] Irena also shared her allegations with Carla Keirstead, a social worker who treated her in individual and group therapy. (Keirstead Dep. Tr. 12:17–24, PX 4.) This limited excerpt from Keirstead's deposition transcript was admitted under Federal Rule of Civil Procedure 32(a)(4)(B).

11

therefore necessary to evaluate the witnesses' credibility to resolve these factual disputes.

In assessing the witnesses' credibility, the Court recognizes that a significant amount of time has elapsed since January 15, 2015. Additionally, the critical events at issue—Irena's outburst in the medical unit, her escort into the elevator, and her arrival at the female property unit—transpired over merely a few minutes, at most. As a result, some minor inconsistencies are to be expected across the witnesses' testimony. Nevertheless, the Court highlights some specific concerns regarding the credibility of the parties and their witnesses below.

1.      **Credibility of Plaintiff's Witnesses**

As a result of her untimely death, Irena never testified in this case. However, her credibility—or lack thereof—remains crucial to its outcome, given that Plaintiff's witnesses' testimony was largely based on Irena's own hearsay statements. Irena was never cross-examined, and the Court did not have the opportunity to observe her demeanor on the witness stand. For the reasons outlined below, the Court has serious concerns regarding her credibility.

First and foremost, Barbara forcefully condemned Irena's penchant for lying. During their January 16, 2015 telephone call, Barbara repeatedly accused Irena of lying. She stated that Irena would "never" tell the truth—even when she was in jail—and that Irena lied to her family "every single day." (DX B.) On the witness stand, Barbara attempted to characterize her statements as directed only towards Irena's frequent lies regarding her drug use. (Tr. I 199:24–200:9.) Even accepting Barbara's testimony as true, however, the Court cannot ignore Irena's own mother's damning indictment of her credibility.

Second, Irena was behaving erratically and aggressively in the medical unit and during the key events at issue. As noted above, Losee testified that she was "very angry" and "agitated," and, "[s]he was saying 'fuck that doctor, fuck this place, I'm not listening to her.'" (Tr. II 44:22–45:3.) Attempts to calm Irena down drew only more ire. (Tr. II 45:4–15, 51:6–16; PX 8.) Quinones

12

agreed that Irena was "agitated," and he also testified that she was being "verbally abusive" towards Santacroce and others. (Tr. II 106:7–12.) Walsh, too, observed Irena's "verbally abusive" behavior. (Tr. III 24:24–25:23.) Given Irena's behavior and apparent mental state during this critical time period, the Court is concerned about her ability—and willingness—to accurately recount the events at issue.[7]

Despite the Court's doubts as to Irena's credibility, the Court credits the testimony of her co-detainees. Vallon, Brophy, and Lorenz provided consistent testimony regarding Irena's arrival on the minor tier, namely that Irena: (i) was escorted to her cell by multiple COs in SERT gear; (ii) was wearing "red and whites," as well as handcuffs, shackles, and a belly chain; (iii) appeared severely agitated and was crying; (iv) told them that COs had beaten her in an elevator and had ripped out her braids; (v) showed them approximately three red coin-sized spots on her head where her hair appeared to have been removed; and (vi) showed them red marks on her wrists where she claimed she had been handcuffed. (See Section I.B.3.) Their testimony was also corroborated in substance by the recording of Irena's phone conversation with Barbara on January 16, 2015.

Defendants argued in their summation that Brophy's and Lorenz's demeanor on the witness stand rendered them not credible. (Tr. IV 7:2–14.) However, even if the Court agreed with Defendants' characterization of their demeanor, their testimony regarding the key events at issue was consistent with Vallon's, whom the Court deems entirely credible. Thus, the Court rejects Defendants' argument that Brophy's and Lorenz's testimony should be disregarded.

Finally, the Court also credits Barbara's testimony, with the following exceptions. First, the Court is unconvinced by Barbara's testimony that she visited Irena while Irena was incarcerated at SCCF in January and February 2015. Her claim is contradicted by SCCF's visitor logs, (DX

---

[7] Irena also may have been in withdrawal upon her arrival at SCCF. As noted above, Lorenz testified that while at SCCF she observed Irena experience withdrawal related to her heroin use. (Tr. I 137:25–138:6.)

13

A), which reflect only visits by her husband, Richard. Although Plaintiff disputed the reliability of SCCF's records at trial, (see, e.g., Tr. IV 30:8–31:21), if Barbara had in fact been present with Richard when he visited Irena, she could have called him to testify to that fact. Therefore, Richard's absence at trial was telling. Second, Barbara's failure to document Irena's injuries when Irena was released from SCCF in February 2015 casts doubt on her testimony that she still "could see where [Irena's] hair was missing[.]" (Tr. I 211:7.) The Court disagrees with Plaintiff's counsel's assertion that only a "litigator" would have documented Irena's injuries. (Tr. IV 32:11–19.)

### 2. Credibility of Defendants

The Court largely credits Defendants' testimony, with some exceptions. Santacroce, Quinones, and Walsh all testified to a relatively consistent timeline of events: (i) in the medical unit, Irena began behaving aggressively and verbally abusing staff after she refused a directive to remove the braids from her hair; (ii) Irena repeatedly ignored requests by Losee and Santacroce to calm down; (iii) Quinones and Walsh were called to the medical unit as the SERT officers on duty; (iv) Irena was transported, possibly in handcuffs, by Santacroce, Olsen, Quinones, and Walsh from the medical unit to the elevator in SCCF's north lobby; (v) Irena continued to verbally abuse Santacroce during the short walk to the elevator; (vi) once inside the elevator but before it reached the fifth floor, Irena kicked backwards in a possible attempt to strike Santacroce, but Santacroce avoided or deflected her kick; (vii) upon arrival on the fifth floor, Santacroce, Olsen, Quinones, and Walsh deposited Irena, uninjured, at the female property unit. (See Sections I.B.1, B.2.) Losee also corroborated his co-Defendants' testimony regarding the events that occurred in the medical unit. (Id.) Contemporaneous incident reports filed by Losee and Santacroce also support Defendants' testimony. (DX J-5, J-6.)

However, certain aspects of Defendants' testimony give the Court pause. At his deposition,

14

Santacroce disclaimed any knowledge of the cause of Irena's anger and denied that he ordered her to remove her hair braids. (Santacroce Dep. Tr. 19:2–20:11.) In light of his co-Defendants' testimony at trial and the documentary evidence to the contrary, the Court finds these assertions not credible and discounts this aspect of Santacroce's testimony accordingly. The Court is also perplexed by Walsh's detailed trial testimony regarding the events of January 15, 2015, given his previous statements to the Sheriff's Department's Internal Affairs Bureau—made only one year after the events at issue—that he had no recollection of any incident involving Irena. (Tr. III 74:17–24; DX J-2.)

B.     **Weight of the Evidence**

Based on the Court's assessment of the witnesses' credibility and its evaluation of the other evidence admitted at trial, the Court finds that Plaintiff has failed to prove her excessive force claim by a preponderance of the evidence.

First, the Court assigns greater weight to Defendants' testimony. Defendants—along with Vallon, Brophy, Lorenz, and Barbara—were generally credible witnesses, with some exceptions noted above. However, as Plaintiff conceded in her summation, her case boils down to "what happened in the elevator between Irena Costanzo and [Defendants] between the first floor and the fifth floor[.]" (Tr. IV 27:13–16.) And with this in mind, Defendants' testimony must carry greater weight. Defendants were the only witnesses to testify at trial who directly observed the elevator ride and the other key events in this case, including Irena's outburst in the medical unit, their escort of Irena to the elevator, and Irena's arrival at the female property unit. And, as discussed above, their testimony regarding these events was mostly consistent. They all testified that Irena was severely agitated, behaving erratically, and verbally abusive towards SCCF staff; that they employed only de minimis physical force as they escorted her from the medical unit to the female

property unit; and that she was uninjured when they deposited her at the female property unit.[8] Based on their testimony, their actions were entirely inconsistent with a finding that they used excessive force against Irena.

On the other hand, the Court assigns less weight to the testimony of Vallon, Brophy, Lorenz, and Barbara regarding these key events. Unlike Defendants, they did not directly observe Irena in the medical unit, during the escort, or upon her arrival in female property. And, most importantly, they did not personally observe what transpired during the elevator ride. As a result, although Vallon, Brophy, Lorenz, and Barbara were mostly credible witnesses, their secondhand testimony is fundamentally less persuasive than Defendants' testimony. The value of their testimony is further undermined by their complete reliance on Irena's description of the critical events. Because the Court has already determined that Irena was less than credible, the Court must further discount the value of their testimony regarding these events.

Second, the Court finds that testimony by Barbara, Vallon, Brophy, and Lorenz regarding their personal observation of Irena's alleged injuries is not sufficient to prove Plaintiff's excessive force claim. All four testified that they directly observed Irena's alleged injuries—coin-sized areas on Irena's head where her hair appeared to have been removed, as well as redness and bruising on her wrists. (See Sections I.B.3, I.C.) Given that their testimony on this subject was based on their own personal observations, the Court assigns it greater weight than their testimony regarding the elevator ride and other key events.

At the same time, however, the Court notes that Plaintiff failed to produce any medical evidence or other documentation of Irena's alleged injuries. For example, although Irena briefly

---

[8] Plaintiff did not call any witness from the female property unit, even though such a witness presumably would have been able to testify regarding Irena's condition upon her arrival at female property. This gap is all the more puzzling given that Plaintiff received documents in discovery identifying the CO in the female property unit who took inventory of Irena's property on January 15, 2015. (PX 8 at 29.)

returned home from SCCF in mid-February 2015, Barbara did not photograph or otherwise document the bald spots that remained on Irena's head. (Tr. I 195:6–13, Tr. II 27:6–17.) Accepting their testimony as true, these spots would have remained visible for months following the alleged incident, even as Irena's hair began to grow back, but they were never documented. In any event, even if Plaintiff could offer additional corroborating evidence of Irena's injuries, it would not tip the balance in her favor. As explained above, it is Plaintiff's burden to prove that Defendants used objectively unreasonable force against Irena. Kingsley, 576 U.S. at 396–97. Testimony by Barbara, Vallon, Brophy, and Lorenz regarding their observations of Irena's alleged injuries does not establish that those injuries were inflicted by Defendants' use of objectively unreasonable force.[9]

After weighing the parties' and witnesses' testimony and the other evidence adduced at trial, the Court concludes that Plaintiff has not met her burden of proof. There is certainly evidence that Irena suffered an injury while she was incarcerated at SCCF; however, Plaintiff has failed to prove by a preponderance of the evidence that Defendants used excessive force against her on January 15, 2015.

## IV.  CONCLUSION

Irena Costanzo's death was tragic, and the Court offers its condolences to her family. However, for the reasons set forth above, the Court finds that Plaintiff has failed to prove her excessive force claim by a preponderance of the evidence. As a result, Defendants are not liable to Plaintiff under 42 U.S.C. § 1983. Because Plaintiff's excessive force claim fails, her motion to

---

[9]  Plaintiff's excessive force claim with respect to Irena's alleged wrist injuries fails for the additional reason that she has not offered any evidence that "the allegedly tight handcuffs caused [Irena] any injury beyond temporary discomfort." Tutt, 2022 WL 17976820, at *3 n.4; see also Rodriguez v. Robinson, No. 16-CV-9604, 2020 WL 1435215, at *3 (S.D.N.Y. Mar. 24, 2020) (rejecting excessive force claim based on tight handcuffing because "[w]hile the minimal evidence of injury introduced at trial (e.g., photographs of minor bruising) is consistent with a small amount of force having been utilized during a struggle to place plaintiff in handcuffs, such force cannot credibly be described as excessive").

17

amend, (ECF No. 68), is DENIED as moot.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

**SO ORDERED.**

Dated:  June 29, 2023
Central Islip, New York

                                                                /s/   (JMA)
                                                          JOAN M. AZRACK
                                                          UNITED STATES DISTRICT JUDGE